IN THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT


CASE NO. 23-11143

_____

ANYA WEATHERLY,

Plaintiff-Appellant,

vs.

ABC LEGAL SERVICES, INC., a Washington Corporation,
ABC LEGAL SERVICES, LLC, a Florida Limited Liability Company and
ABC LEGAL SERVICES, LLC, a Washington Limited Liability Company,

Defendants-Appellees

_____


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
_____


INITIAL BRIEF OF APPELLANT ANYA WEATHERLY
_____

Donald R. McCoy
Florida Bar No. 887862
DONALD R. McCOY, P.A.
111 S.E. 12th Street
Fort Lauderdale, Florida  33316
Telephone:  954-618-6575
Telecopier:  954-618-6577
mccoyesquire@me.com

Attorney for Appellant
Anya Weatherly

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Appellant Anya Weatherly, by and through her undersigned attorney and pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, submits the following certificate listing all trial judges, attorneys, persons, associations of persons, firms, partnerships and corporations having an interest in the outcome of this case and this appeal:

ABC Legal Services, Inc., a Washington Corporation

ABC Legal Services, LLC, a Florida Limited Liability Company

ABC Legal Services, LLC, a Washington Limited Liability Company

Aquiline Capital Partners

Donahoe, Seth

Gayles, Darrin P., United States District Judge

Hoestenbach, Hunter H.

Kahn, Meera

Lehrer, Ryan H.

Lopez, Paul O.,

McCoy, Donald R.

C-1

Otazo-Reyes, Alica M., United States Magistrate Judge

Pincus, Jacob

Tripp Scott, P.A.

Waldman, Glenn J.

Weatherly, Anya

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant suggests it would be helpful for the Court to hear oral argument in this case in particular as to whether the district court failed to follow precedent such as *Thomas v. Dillard Department Stores*, 116 F.3d 1432, 1437 (11th Cir. 1997) in dismissing Plaintiff-Appellant's discrimination and retaliation claims and found, instead, that she failed to show that her termination was an "adverse employment action."

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . C-1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . .i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .xii

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

      B.   Course of the Proceedings and Disposition By The
           District Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      C.   Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

      D.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ii

ARGUMENT AND CITATIONS OF AUTHORITY . . . . . . . . . . . . . . . . . . . . . . 23

    1.    The district court erred in dismissing, at the pleading stage, Ms. Weatherly's claims that she was subjected to a hostile work environment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

    2.    Appellant exhausted her administrative remedies as to all her claims including her claim of national origin discrimination . . . . . . . . . . 26

    3.    Ms. Weatherly suffered an actual discharge, a material "adverse action" under Title VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

    A.    By their words and conduct the employer's representatives showed a clear intention to sever the employment relationship . . . . . . . . .. . . . . . . . .. . . . . . . .. . . . . . . . . . . . . . . .. . . . . . . ..31

    B.    A reasonable person in Ms. Weatherly's position would have believed she was discharged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    4.    Genuinely disputed material facts preclude summary judgment as to Ms. Weatherly's allegations of discrimination based on her race and national origin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

    A.    The evidence establishes a valid prima facie case of discrimination based on her race and ethnicity . . . . . . . . . . . . . . . . . . . . 34

B.    The evidence taken as a whole would allow a reasonable fact-finder to conclude that the Defendants' proffered reasons are pretexts for discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1.    The evidence would permit a reasonable fact-finder to disbelieve Defendants' assertion that Ms. Weatherly resigned . . . . . . 40

2.    Mr. Melo's racially charged comments permit a finding that discrimination more likely motivated Defendants' termination of Ms. Weatherly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

4.    There are genuine disputes as to material facts which preclude summary judgment as to Ms. Weatherly's claims of retaliation for protected opposition activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

A.    Ms. Weatherly engaged in statutorily protected activity when she opposed apparent racial discrimination against Leonard Gartman and Jason Jones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

B.    She engaged in statutorily protected activity when she complained to ABC Legal's human resources director Jenny Davis about unlawful discrimination and the retaliation she experienced following her previous complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

iv

C.    Immediately afterward she suffered adverse actions both within and outside the workplace . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

D.    A jury could reasonably conclude that the employer's actions were causally related to her protected activity. . . . . . . . . . . . . . . . . . . . . . . . 48

E.    Evidence of pretext creates a genuine issue, precluding summary judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

5.    The discriminatory and retaliatory conduct may be attributed to the Defendants-Appellees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

A.    ABC Legal is liable for tangible adverse actions which are based on the actions of a biased supervisor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

B.    Mr. Melo's bias and intention to cause an adverse employment action demonstrate "cat's paw" liability on the part of ABC Legal . . . . . . . 52

1.    The human resource personnel acted on his recommendation without independently investigating his contention that Ms. Weatherly quit and his denial that she discussed her surgery with him before taking medical leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

2.    Melo's biased reports were the proximate cause of Ms. Weatherly's termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

vi

## TABLE OF CITATIONS

**Cases:**                                                                    **Page**

*Alexander v. Fulton County,*
    207 F.3d 1303, 1332 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Allen v. Tyson Foods*,
    121 F.3d 642, 647 (11th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) . . . . . . . . . . . . . . . . . 21

*Bonner v. Prichard*, 661 F.2d 1206, 1210 (11th Cir. 1)981 . . . . . . . . . . . . . 30

*Broward County. Bd. of Commissioners,*
    974 So. 2d 458, 460 (Fla. 4th DCA 2008) . . . . . . . . . . . . . . . . . . . . . . 44

*Bullard v. OMI Ga, Inc.,* 640 F.2d 632, 634 (5th Cir. 1981) . . . . . . . . . . . 29

*Burlington N. & Santa Fe Ry. v. White,*
    548 U.S. 53, 67, 126 S. Ct. 2405, 2414 (2006) . . . . . . . . . . . 44, 47, 48

*Hankins v. Air Trans Airways,*
    237 Fed. Appx. 513, 520 at Note 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Chertkova v. Connecticut Gen. Life Ins. Co.,*
    92 F.3d 81, 88-89 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

*Combs v. Plantation Patterns,*
    106 F.3d 1519, 1538 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Conley v. Gibson*,
    355 U.S. 41, 45-46, 78 S. Ct. 99, 101-102,
    2 L. Ed. 2d 80 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*Cooper v. Ga. DOT*,
    837 F. App'x 657, 667 (11th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . .38

*Crawford v. Metropolitan Gov't of Nashville and Davidson County,*
    *Tennessee,* 555 U.S. 271,276; 129 S.Ct. 846, 850 (2009) . . . . . . . . . . 45

*Davis v. Town of Lake Park*,
    245 F.3d 1232, 1238-39 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . .31

*Donovan v. Tequesta v. Luscavich*,
    240 So. 3d 733, 738 (Fla. 4th D.A, 2018); *Broward County.*
    *Bd. of Commissioners*, 974 So. 2d 458, 460
    (Fla. 4th DCA 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

*Faragher v. City of Boca Raton*,
    524 U.S. 775, 790, 118 S. Ct. 2275, 2284 (1998). . . . . . . . . . . . . . 25, 51

*Farley v. Nationwide Mutual Ins. Co.*,
    197 F.3d 1322, 1337 (11th Cir. 1999) . . . . . . . . . . . . . . . . .48, 49, 50, 51

*Green v. Elixir Indus.*,
    407 F.3d 1163, 1167 - 1168 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 28

*Gregory v. Ga. Dep't of Human Resources,*
    355 F.3d 1277, 1280 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 28, 43

*Griffith v. Nicholas Financial, Inc.*,
    214 F. Supp. 3d 1215, 1225 (N.D. Ala. 2016) . . . . . . . . . . . . . . . . . 31, 32

*Henry v. University of S. Florida Bd. of Trustees*,
    2009 U.S. Dist. LEXIS 115227,
    at *10-12 (M.D. Fla. Dec. 10, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Johnson v. City of Shelby*,
    574 U.S. 10, 11, 135 S. Ct. 346, 347 (2014) . . . . . . . . . . . . . . . . . . . . . . 24

*Kademiya v. Hunter Douglas Window Fashions, Inc.*,
　　2006 WL 1991754, 2006 U.S. Dist. LEXIS 47884,
　　at *13 (D. Colo. July 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

*Le Dew v. Unemployment Appeals Com.*,
　　456 So. 2d 1219, 1223-24 (Fla. Dist. Ct. App. 1984) . . . . . . . . . . . . . . 34

*Lewis v. City of Union City*,
　　918 F.3d 1213, 1227 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . .35, 38

*Lewis v. City of Union City*,
　　934 F.3d 1169, 1178 (11th Cir. 2019) . . . . . . . . . . . . . . . . . 21, 35, 36, 39,

*Little v. United Technologies, Carrier Transicold Division*,
　　103 F.3d 956, 959 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

*Llampallas v. Mini-Circuits, Lab, Inc.*,
　　163 F.3d 1236, 1246 n. 18 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . 31, 53

*McDonnell Douglas Corp. v. Green*,
　　411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973) . . . . . . . . . . . . . . . . . . .36

*NLRB v. Ridgeway Trucking Co.*,
　　622 F.2d 1222, 1224 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*NLRB v. Trumbull Asphalt Co.*,
　　327 F.2d 841, 843 (8th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Payne v. Crane Co.*,
　　560 F.2d 198, 199 (5th Cir.1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Putnam v. Lower*,
　　236 F.2d 561, 566 (9th Cir. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Reeves v. Sanderson Plumbing Products*,
　　530 U.S. 133, 150-51, 120 S. Ct. 2097, 2110 (2000) . . . . . . . . . . . .21, 41

*Reynolds v. Winn-Dixie Raleigh Inc.*,
    620 F. App'x 785, 792 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Rioux v. City of Atlanta*,
    520 F.3d 1269, 1274 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 21, 40

*Roberts v. Rayonier, Inc.*,
    135 F. App'x 351, 358 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Saint Francis College v. Al-Khazraji*,
    481 U.S. 604, 614, 107 S. Ct. 2022, 2028-29 (1987) . . . . . . . . . . . . . . 29

*Sanchez v. Standard Brands, Inc.*,
    431 F.2d 455, 462 (5th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Smith v. Lockheed-Martin Corp.*,
    644 F.3d 1321, 1328 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Standard v. A.B.E.L. Services*,
    161 F.3d 1318, 1331 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . 36, 38, 41, 42

*Stimpson v. City of Tuscaloosa*,
    186 F.3d 1328, 1332 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . .52

*Staub v. Proctor Hosp.*,
    562 U.S. 411, 422, 131 S. Ct. 1186, 1194 (2011) . . . . . . . . . . . . . . . . . .52

*Suevsky v. Walt Disney World Parks & Resorts Online, Inc.*,
    2016 WL 3387620, 2016 U.S. Dist. LEXIS 79829,
    at *3 (M.D. Fla. June 20, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506, 508, 122 S. Ct. 992, 995 (2002) . . . . . . . . . . . 23, 24, 25

*Texas Dep't of Community Affairs v. Burdine*,
    450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981) . . . . . . . . . . . . . . . . 40

x

*Thomas v. Dillard Department Stores*,
116 F.3d 1432, 1437 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 22, 32, 33

*Tiftarea Shopper, Inc. v. Ga. Shopper, Inc.*,
786 F.2d 1115, 1117-1118 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . 23, 25

*Weeks v. Harden Mfg. Corp.*,
291 F.3d 1307, 1311 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . .21,

*Young v. Southwestern S & L Association*,
509 F.2d 140 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

## Statutes and Regulations:

28 U.S.C. §§1331,1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .xii

42 U.S.C. §2000e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 USCS §§ 2000e–2000e-17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

29 C.F.R. §1606.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31

Fla. Stat. §§760.01-760.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fla. Stat. §760.10(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Fla. Stat. §760.11(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## Rules:

Rule 60(b), Fed. R. Civ. P . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Rule 12(b)(6), Fed. R. Civ. P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Rule 8(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## STATEMENT OF JURISDICTION

The basis for subject matter jurisdiction in the district court was 28 U.S.C. §1331 in that Plaintiff-Appellant's Amended Complaint alleged violations of laws of the United States: Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq. The district court had supplemental jurisdiction of Plaintiff-Appellant's state law claims under the Florida Civil Rights Act, Fla. Stat. §§760.01-760.11, pursuant to 28 U.S.C. 1367.  This Court has jurisdiction of this appeal under 28 U.S.C. §1291 in that on April 7, 2023, Plaintiff-Appellant timely filed a notice of appeal from the final order of the district court, entered on March 10, 2023, which granted the Defendants-Appellants' motion for summary judgment, disposing of all parties' claims.

## STATEMENT OF THE ISSUES

1.    Whether Ms. Weatherly alleged sufficient facts to support her claim that she was subjected to a hostile work environment - which the district court dismissed at the pleading stage under Rule 12(b)(6), Fed. R. Civ. P.

2.    Whether she exhausted her administrative remedies as to her allegations of discrimination based on her national origin despite having not checked that box on the EEOC charge of discrimination form.

3.    Is there a genuine dispute as to material facts which preclude summary judgment regarding whether Ms. Weatherly suffered an actual discharge or voluntarily resigned?

4.    Did the district court err in determining that she could not prove, *prima facie,* discrimination based on her race or retaliation because her termination was not an "adverse employment action."

5.    Is there circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent and/or evidence that its purported nondiscriminatory reason for terminating Ms. Weatherly's employment is not credible?

## STATEMENT OF THE CASE

### A.    Nature of the Case

Plaintiff-Appellant Anya Weatherly[1] filed this action *pro se* after receiving a right to sue notice from the Equal Employment Opportunity Commission.  She alleged discrimination based on her race, national origin, retaliation and a hostile work environment. The district court granted the Defendant's motion to dismiss her original complaint but referred her case to the Southern District of Florida's volunteer attorney program.  D.E. 10. The undersigned represents her under that program *pro bono*.  He filed an amended complaint and a second amended complaint under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., and the Florida Civil Rights Act, Fla. Stat. §§760.01-760.11, alleging the same.

### B.    Course of the Proceedings and Disposition By the District Court

The district court granted Plaintiff-Appellant's motion under Rule 60(b), Fed. R. Civ. P., D.E. 20, and set aside its order of dismissal.  D.E. 24. Plaintiff filed an amended complaint which the district court also dismissed upon Defendants' second motion to dismiss, ruling that the amended

---

[1] When she was employed by ABC Legal Ms. Weatherly sometimes used "Anna" as her first name.  Her personnel file records are under the true spelling, "Anya" [D.E. 85-11, p.4] which is used in her pleadings in the district court and in this brief.

complaint was only supported by "conclusory" allegations.  D.E. 45.  The district court then granted in part Defendants' third motion to dismiss Plaintiff-Appellant's second amended complaint, dismissing her "hostile work environment" claim - again ruling that her allegations were "conclusory" - but allowing her race, national origin and retaliation claims to proceed.

Subsequently, the district court granted the Defendants' motion for summary judgment and dismissed the remaining claims.  D.E. 131.  As discussed below, Ms. Weatherly had requested information from the ABC Legal's human resources department regarding the policy on medical leave.  Acting upon the information she received she then notified her supervisor and human resources via email on November 1, 2017, that she was taking medical leave due to health issues for which surgery was scheduled.  [D.E. 85-6, p. 214].

The district court noted that "The parties dispute whether Plaintiff's November 1, 2017, email constituted her notice of voluntary resignation . . ." D.E. 131, p. 7.   Nonetheless the court found that a reasonable person in Defendants' position "would have understood that Plaintiff voluntarily resigned. Accordingly, Plaintiff fails to establish . . . that she suffered an adverse employment action."  D.E. 131, p. 17.

For this reason the district court found that Ms. Weatherly could not establish a *prima facie* case that her discharge was racially discriminatory or due to retaliation.   D.E. 131, p. 17, 20.   The district court also granted summary judgment as to Ms. Weatherly's claims of national origin discrimination because she had not checked the "national origin" box when she filed her charge of discrimination with the EEOC.  D.E. 131, p. 11 -12.

Lastly, the district court granted summary judgment as to Ms. Weatherly's allegations of racially based disparate treatment, that an African-American co-worker was allowed time off from work and Ms. Weatherly was not, and was treated more favorably in other respects.  The court held that the co-worker was not a valid comparator because of differing job responsibilities and that in any event the evidence did not establish that she was treated more favorably because she was Black.  D.E. 131, p. 19.

### C.    Statement of the Facts

Plaintiff-Appellant Anya Weatherly is a single mother raising three children D.E. 97-1, Deposition of Anya Weatherly, p. 11, 17 - p. 12, 8.  She is of Russian descent, was born and raised in the former Soviet Union and immigrated to the United States as an adult.   She describes her race is Caucasian and "white."

Ms. Weatherly started with ABC Legal in August, 2017, as a "Logistics Specialist" at the company's office in Dania Beach, Florida. Carlos Melo, the office manager, interviewed her for the job.  D.E. 97-1, p. 13, 7-14, 22; D.E. 85-11, p. 2-3.  Her responsibilities included receiving legal documents and scanning them into the company's software system, sorting the documents and providing them to the process servers.  D.E. 97-1, p. 17, 5-20.

Mr. Melo testified that she was qualified for her position and satisfactorily performed her job at all times.  D.E. 85-2, p. 55, 20-23; p. 81, 7-13.

There were three persons working full time in the office, Mr. Melo, Ms. Weatherly, and a co-worker named Konya Robinson.  Process servers and runners came in as necessary to pick-up or drop off legal documents. D.E. 97-1, p. 39, 3-5.

Ms. Robinson and Ms. Weatherly were both supervised by Mr. Melo; they were both involved in handling the paperwork for the process servers. D.E. 97-1, p. 55, 13-19; p. 56, 7-9.  Both were paid hourly and were subject to the same policies as set forth in the Defendants' employee handbook.

After she started working Ms. Weatherly began to experience health issues, in particular an adverse reaction to breast implants which caused arthritis-like symptoms. There was dust coming into the office from a

nearby construction site which aggravated her condition.  D.E. 97-1, p. 20, 10 - p. 21,14; p. 22,10-23.

When she told Mr. Melo that she needed to leave work one or two days a month to see her doctor he showed her a calendar with the dates available for employees to take time off; they were to mark the dates requested.  Ms. Weatherly found all of the available dates marked as days off for Ms. Robinson.  Melo would not allow Ms. Weatherly to be off at the same time as Ms. Robinson.  As a result she was unable to see her doctor during working hours. D.E. 97-1, p. 20, 10 - p. 21, 14; p. 29, 23 - p. 30, 21; p. 203, 19 - p. 205, 7.

Ms. Weatherly worked full time, five days a week except when the office was closed for several days during September, 2017 and a mandatory evacuation was ordered when Hurricane Irma threatened South Florida. D.E. 97-1, p. 35, 2-18.

The way their offices were situated she could hear conversations between Mr. Melo and Ms. Robinson.   Often they were loud, making it difficult for Ms. Weatherly to focus on her work. D.E. 97-1, p. 37, 13 - p. 38, 5.  She heard them making derogatory comments about managers at the company's headquarters in Seattle.   They complained that mangers were only there because they were white, that Carlos and Konya had lower

positions and were "in financial slavery" because they were Latin and African-American. D.E. 97-1, p. 40, 20 - p. 42, 8. p. 46, 11-17,

They made vulgar comments about a Russian-speaking woman in the Seattle office - Nadya Onishchenko.  D.E. 97-1, p. 49, 14-21.  Ms. Weatherly found such remarks hard to listen to because she is also a white person and of Russian descent.  D.E. 97-1, p. 46, 18-25.

Konya Robinson's responsibilities included printing incoming legal documents and distributing them to the process servers.  She confided in Anya about one process server who had worked there previously and who was, in her words, "up her nose."  Ms. Robinson said she got rid of this person by assigning the work to another process server. D.E. 97-1, p. 46, p. 43, 20 - p. 44, 19

Ms. Weatherly came to believe that Konya Robinson was doing the same to two white male process servers, Leonard Gartman and Jason Jones.  The moment they would leave the office Ms. Robinson would start using profanity and saying how she hated them. D.E. 97-1, p. 45, 7 - p. 46, 5.

When a new process server was hired, an African-American woman, Ms. Weatherly observed that Konya was assigning work to her and not to Leonard and Jason.  D.E. 97-1, p. 47, 7-20.  She heard Konya tell Leonard and Jason there is "no work for you today."  After they left she saw Konya

give a number of assignments to the African-American woman. D.E. 97-1, p. 60, 4-25

During the office closure for Hurricane Irma Ms. Weatherly called Nadya Onishchenko in the Seattle office who managed the company's East coast offices and process servers. She told Nadya what she observed and felt was discrimination against the two white process servers. D.E. 97-1, p. 50, 6-20; p. 155, 17-22.

The office re-opened in mid-September after the hurricane threat was over. During a conference call Carlos learned from Nadya Onishchenko that the procedure for assignment to the process servers was being changed. D.E. 97-1, p. 64, 6-21. Control of the assignments and printing of the paperwork would be done in the Seattle office, bypassing Ms. Robinson.

Carlos Melo was furious. He and Konya called the changes "stupid" and said those "gringos" in the Seattle office don't have anything else to do. D.E. 97-1, p. 52, 14-20. Carlos was walking around the office in circles looking angry and calling the management "stupid" and "entitled." Regarding Ms. Weatherly he was shouting "there must be a snitch in the office." D.E. 97-1, p. 51, 21 - p. 52, 2; p. 81, 9-5; p, 156, 1-15; p. 156, 23 - p.157, 19; p. 158, 23-25.

Following another conference call with Nadya and her boss, Carlos made vulgar comments about Nadya "blowing her boss" and said that Russians are "prostitutes." D.E. 97-1, p. 159, 1 - p. 160, 21. He knew that Anya was also Russian. D.E. 97-1, p. 63, 8-15.

After this the atmosphere in the office changed. Anya began to notice that when she walked in Carlos and Ms. Robinson would stop talking. D.E. 97-1, p. 53, 3-12. Carlos moved Anya to a small closet behind the office and instructed her to scan thousands of pages of documents which were years old and scheduled to be thrown away. This task took her away from her usual duties and took several days to complete. D.E. 97-1, p. 85, 10 - p. 86, 22.

She testified that during the last month she worked there, Mr. Melo "wasn't communicating with me at all. He was only communicating with Konya and treated me like I wasn't even there." D.E. 97-1, p. 31, 13-15.

As she was leaving for lunch one day that same week she found that her car had been smeared with dog feces. D.E. 97-1, p. 62, 10-13. She suspected Carlos; he knew the car she drove and where she parked and had shown her photos of his two large dogs. D.E. 97-1, p. 73, 2-15. On another day she found her tires had been slashed. She was too frightened to discuss this with Carlos but she called Nadya a second time, described these

incidents to her and the things they were saying about management. Nadya suggested that Anya should call Jenny Davis in HR. D.E. 97-1, p. 74, 2-20; p. 76, 21; p. 77, 4-24; p. 160, 22-161, 10.

She left several voice messages for Ms. Davis.   D.E. 97-1, p. 163, 15-20.   When Ms. Davis called her back Ms. Weatherly described these incidents; she said that Carlos knew she had reported discrimination to Nadya, that she was being called a "snitch" and assigned new duties.  She said that the office environment had become "hostile" because of her report.   D.E. 97-1, p. 78, 3-15; p. 90, 16 - p. 91,161, l. 12-162, l. 3 (?)

She told Ms. Davis that Carlos had said that "Russian people are prostitutes that blow their bosses under the table," that she believed these remarks were aimed not only at Nadya but also at her because he knew that she is also Russian. D.E. 97-1, p. 94, 2 - 95,1; p. 96, 7-16; p. 162, 12-20.  She said that she "couldn't focus on work with them constantly screaming and arguing, you know, calling me names, calling the management names, gringos, like, every day . . ." D.E. 97-1, p. 162, 20 - p. 163, 15.

Ms. Davis said that she would get back to Ms. Weatherly but she never did call her back.  D.E. 97-1, p.163. 4-15.

At the end of October, 2017, Ms. Weatherly was trying to arrange for the removal of her breast implants.   Her doctor told her that her health

insurance provider had approved the surgery. D.E. 97-1, p. 110, 8-22; p. 111, 12-13.   She contacted Betty Mirkovich in human resources to ask about taking medical leave.

At that time the company's HR department consisted of Ms. Mirkovich, the HR director Jenny Davis and Rosalia Olson who handled the payroll.  D.E. 85-6, Deposition of Betty Mirkovich, p. 13, 19 - p. 15, 17.

On October 30, 2017, Anya sent Ms. Mirkovich the following email [D.E. 85-6, p. 212]:

From: Anna Weatherly
Sent: Monday, October 30, 2017 11:36 AM
To: Betty Mirkovich
Subject: medical leave question

Hello Betty,

Wanted to ask you this: I have an unplanned surgery scheduled for some time soon, could be tomorrow or next month due to a health issue that recently came up.

Does the company pay medical leave? If I go for the surgery, will I be able to keep the job?

Thanks,

Warmly,

Anna

Ms. Mirkovich replied the same day [D.E. 85-6, p. 211]:

From: Betty Mirkovich

11

Sent: Monday, October 30, 2017 5:39 PM
To: Anna Weatherly
Subject: RE: medical leave question

Hi Anna,

I'm sorry to learn you're having health issues.

Paid medical leave falls under PTO. You would use your available PTO
during your absence. To be eligible for FMLA leave (which includes job
protection) an individual must be employed for at least 12 months.
Depending on the length of your absence and the needs of the company,
your position may be held until you return.

Please let me know when you have more information.

Betty Mirkovich

Ms. Weatherly thanked her for her reply and, on October 31, 2017,

sent Ms. Mirkovich a description of her symptoms and the air quality in her

office [D.E. 86-5, p. 211]:

Sent: Tuesday, October 31, 2017 1:55:54 PM
To: BettyM@ABCLegal.com
Subject: RE: medical leave question

Dear Betty,

Thank you for the information.

1. On the health issues, I'm having some concerns- ever since I started
working for ABC in this particular building I started having issues- joint and
muscle pains all over my body, arthritis like, hair and skin thinning,
sneezing and lethargic state. At first I thought it was due to other
factors (even considered surgery) but now I just realized all our offices face
huge construction site, drilling and dust happens daily, we can see
workers through the window. All of us in the office sneeze as well few

times per hour. I suspect construction dust is present in the office. Is there a way to send an industrial hygienist to test air quality in our office for construction dust particles? I was just reading Osha's federal guidelines on that, just to make sure we are not exposed?

2) 401 K: my YTD statement shows $94 in 401k however when I access Kibble account it only shows $72.

Is that normal?

Thank you,

Anna

　　　　Ms. Mirkovich forwarded this email to Jenny Davis who had her contact Carlos Melo about having the building manager test the air quality [D.E. 85-6, p. 213].　A handwritten note indicates that Ms. Mirkovich discussed the construction dust with Melo on November 2, 2017.

　　　　Meanwhile, on November 1, 2017, Ms. Weatherly sent an email to Mr. Melo and to Ms. Mirkovich with the subject "medical leave" [D.E. 85-6, p. 214]:

From: Anna Weatherly
Sent: Wednesday, November 01, 2017 3:00 PM
To: Carlos Melo
Cc: Betty Mirkovich
Subject: medical leave

Dear Carlos,

Unfortunately due to health issues I have to take a break from work. In the last month I developed a severe form of arthritis in the entire body (possibly due to implants disease) which makes it impossible to work.

I just got a call that I'm scheduled for a surgery within the next couple days and now will be resting and preparing for it.

Thank you for your assistance with everything,

The office key is on the table and the computer password is: Iphone10

Warmly,

Anna

Ms. Mirkovich forwarded this email to Jenny Davis and Rosalia Olson in payroll on November 2, 2017, stating "I spoke with Carlos and Anna quit yesterday." [D.E. 85-6, p. 214]. On this email chain Ms. Mirkovich noted in her own handwriting "term 11/1/17."

The same day, November 2, 2017, Carlos sent an email to Jenny Davis stating that "Anna quit yesterday afternoon [due to health reasons]" and asking if he could fill her position. [D.E. 85-5, p. 150 - 151].

No one contacted Ms. Weatherly about her intentions or told her she was terminated. D.E. 97-1, p. 114, 11 - p. 115, 3. She learned about it a week later on November 9, 2017, when she tried to access funds in her flexible savings account to pay for her daughter's aftercare. She was told that her account was frozen. D.E. 97-1, p. 131, 4-8

Anya learned from Accrue Solutions that she had been terminated on November 1 and that ABC Legal had not made a deposit to her account. She called Betty Mirkovich who confirmed in an email that she was

terminated and referred her back to Accrue Solutions, the company that administered the flexible savings accounts.   D.E. 97-1, p. 131, 16-24; p. 132, 3-16.   She had signed up for two FSA's, one for medical expenses and the other for child care; deductions were made from her pay, pre-tax, and deposited to these accounts for her to use.  D.E. 85-6, p. 49, 20 - p. 50, 23.

As should be obvious from her emails to Ms. Mirkovich on October 30 and 31, and November 1, Anya had no intention of resigning.  She testified that she had gone through months of training on ABC Legal's software.  She was going through a divorce and the job with ABC Legal was the only way to support herself and her children. She understood "medical leave" to mean that she could take off work to go for the surgery.  She didn't ask for the time off to be paid but did not want to leave her job.  D.E. 97-1, p. 113, 1-21.

She told Ms. Mirkovich that she was not aware she had been terminated, that she thought Ms. Mirkovich's October 30 email was authorization for her to take leave. She said that she had spoken to Carlos about her surgery and told him she thought she could return in a few days. D.E. 85-6, p. 51, 12 - p. 52, 10; p. 110, 1-10.

Ms. Mirkovich testified that Ms. Weatherly made it clear to her that she had not quit and was surprised to learn that she was no longer employed.  D.E. 85-6, p. 58, 2-5.

She had, in fact, told Melo that it was going to be a quick surgery and that she would return within the week.  D.E. 97-1, p. 125, 1-3; p. 128, 1-17. Three days after leaving, however, she learned the insurance approval was withdrawn; she and her physician appealed the withdrawal.  D.E. 97-1, p. 128, 15-129, 15; p. 211, 4-212, 3.

Following Ms. Weatherly's call, Betty Mirkovich sent an email to Carlos Melo and Jenny Davis on November 13, 2017, [D.E. 85-5, p. 141] to tell them "It looks like there was miscommunication by all involved." D.E. 85-6, p. 52, 11-24.

From: Betty Mirkovich
Sent: Monday, November 13, 2017 4:39 PM
To: Carlos Melo <CMelo@ABCLegal.com>; Jenny Davis <JDavis@ABCLegal.com>
Subject: RE: Anna Weatherly

I spoke with Anna. The reason she called me today was regarding her FSA. That's been handled.

What Anna wasn't aware of was her employment was terminated. She thought she could take leave and it was understood she would be on medical leave. I mentioned to her she did not receive approval from anyone to take a leave. Anna stated she'd spoken with Carlos a few times regarding her situation, and that after her surgery she would be able to return within a few days.

Anna thought my email was approval of her leave when I stated "your position may be held until you return". She didn't comment on my email and I didn't follow up with her. Looks like there was miscommunication by all involved.

Betty Mirkovich

Melo answered this email stating "nothing was discussed between Anna and myself."   No one called Ms. Weatherly or tried otherwise to

determine who was telling the truth - Carlos or Anya - regarding what was discussed.  D.E. 85-6, p. 53, 1-13; p. 56, 22-57, 3.

Instead, Ms. Mirkovich sent the following to Carlos and Jenny Davis [D.E. 85-6, p. 221]:

From: Betty Mirkovich
Sent: Monday, November 13, 2017 2:06 PM
To: Carlos Melo; Jenny Davis
Subject: RE: Anna Weatherly

Thank you Carlos.
I'll print the emails for Anna's file and call it good.

Betty Mirkovich

At her deposition Ms. Mirkovich confirmed what she meant by this, that "we were done with the discussion of Anna's employment and that we understood her to have quit." D.E. 85-6, p. 57, 11-22.  Acknowledging that she knew Ms. Weatherly "didn't believe she had quit" Ms. Mirkovich testified "We're going off . . . what Carlos said, which is that she quit."  D.E. 85-6, p. 76, 18-24.

Accordingly, the HR records produced by ABC Legal falsely show that Ms. Weatherly quit for "Personal/Family" reasons on November 1, 2017. D.E. 85-6, p. 75, 10-12; D.E. 85-11, p.4.

Anya began looking for other jobs right away. She filed for unemployment at the end of November but benefits were denied.   D.E.

97-1, p. 132, 17-134, 2.   She applied for other jobs, five times a week as required to qualify for unemployment compensation.  In January, 2018, she finally was hired as a legal assistant for a law firm in Aventura, Florida. D.E. 97-1, p. 134, 10-25.

She received no benefits so she borrowed money to pay for removal of her breast implants; the surgery took place on February 5, 2018.  She was off work for another week and then returned to her job with the law firm where she worked until the end of May.  D.E. 97-1, p. 135, 13-136, 20.

She left that job because of child care issues - particularly for one of her children who has "special needs" - when school was let out for the summer and she couldn't find a nanny.   D.E. 97-1, p. 138, 1-15; 139, 4-6. Her son, who was eight at the time, has Downs syndrome and autism. D.E. 97-1, p. 164, l. 10-20.

Anya filed a charge of discrimination with the EEOC and the Florida Commission on Human Relations on August 27, 2019 [D.E. 85-6, p. 324-325].  Her charge states that she is a white woman of Russian descent; that Carlos Melo is Hispanic and Konya Robinson an African-American; she describes their loud conversations and the disruptive work environment, their vulgar comments about Nadya and others in the Seattle office, referring to white people as "gringos."   She describes her dealings

with Betty Mirkovich and Jenny Davis and her complaints of discrimination to Nadya and to Ms. Davis. Finally, she provides details of her inquiry about medical leave, Ms. Mirkovich's advice that her job would be safe, taking leave and learning she was terminated when she tried to access her employment benefits.

She later submitted a statement providing more details, D.E. 85-6, p. 315 - 318.

The company's general counsel sent the EEOC investigator a point by point response to the EEOC charge, beginning with his findings on "Discrimination based on race/national origin." D.E. 85-6, p. 319. The attorney says that he conducted an "investigation" of Ms. Weatherly's allegations. None of the persons named in her charge of discrimination were notified, however, that she filed a complaint much less questioned regarding their involvement.

The attorney's findings regarding "Discrimination based on race/ national origin" say that "Carlos denies that he or Konya at any time expressed any dislike of or ill-feelings towards Nadya." Mr. Melo testified that he did not recall having any contact with the attorney, Hunter Hoestenbach, regarding Anya's charge of discrimination D.E. 85-2, p. 91, 17

- p. 92, 3.  Nonetheless, the attorney's response repeatedly says that "Carlos denies" her allegations.

Ms. Weatherly's complaints that Konya Robinson engaged in discriminatory practices regarding assignments to the process servers were not brought to Ms. Robinson's attention by anyone at ABC Legal. D.E. 85-3, p. 33, 8-14, p. 36, 21-24.  No one asked Ms. Mirkovich whether she told Anya her job would be safe if she needed to take medical leave; she never saw Anya's detailed statement nor the attorney's response, although she was still in human resources at the time.  D.E. 85-6, p. 79, 6-24; p. 80, 1-10; p. 80, 22.

The HR director Jenny Davis left the company on November 23, 2017, ten days after she, Melo and Betty Mirkovich discussed the fact that Anya thought she was still employed and decided they would say she had quit.  Like the others, Ms. Davis was never informed that Ms. Weatherly filed a charge of discrimination against ABC Legal.  No one contacted her about it or about Anya's detailed statement [D.E. 85-6, p. 133-136], both of which mention Ms. Davis by name. D.E. 85-6, p. 19, 9-16; 20, 1-6; p. 21, 1-8; p. 23, 1-7

### D.    Standard of Review

This Court reviews a district court's grant or denial of a motion for summary judgment *de novo*, viewing the record and drawing all reasonable inferences in the light most favorable to the non-moving party. *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) and "must resolve all reasonable doubts about the facts in favor of the non-movant," *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008).

The district court likewise "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."   *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 150-51, 120 S. Ct. 2097, 2110 (2000); *Lewis v. City of Union City,* 934 F.3d 1169, 1178 (11th Cir. 2019).

"Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).   The issue of material fact which must be present to entitle a party to proceed to trial "is not required to be resolved conclusively in favor of the party asserting its existence;

rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.*

## SUMMARY OF THE ARGUMENT

The district court erred in excluding Ms. Weatherly's hostile environment claim and her allegations of national origin discrimination. Moreover, the evidence clearly precludes summary judgment on a critical element of her *prima facie* case of race discrimination and retaliation for protected activity, whether the termination of her employment constituted an "adverse employment action."  In this regard the words and actions of the employer's representatives would be perceived by a reasonable person exactly as Ms. Weatherly viewed them: that she was discharged while taking what she believed was an approved medical leave of absence.

In its ruling to the contrary, the district court failed to follow the guidance of this Court in *Thomas v. Dillard Department Stores*, 116 F.3d 1432, 1437 (11th Cir. 1997) and similar cases from other judicial circuits.

The evidence also supports the Appellant's claims of racially discriminatory bias and retaliation for protected activity on the part of her immediate supervisor, for which the employer ABC Legal ultimately is liable.

## ARGUMENT AND CITATIONS OF AUTHORITY

**1.    The district court erred in dismissing, at the pleading stage, Ms. Weatherly's claims that she was subjected to a hostile work environment.**

A district court should grant a motion under Rule 12(b)(6), Fed. R. Civ. P. only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.". *Tiftarea Shopper, Inc. v. Ga. Shopper, Inc.,* 786 F.2d 1115, 1117-1118 (11th Cir. 1986) citing *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-102, 2 L. Ed. 2d 80 (1957).

The Supreme Court cited *Conley* in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, 122 S. Ct. 992, 995 (2002) which held that there is not a "heightened standard" for pleadings in an employment discrimination case. Rule 8(a), Fed. R. Civ. P. requires simply that the complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley, supra,* 355 U.S. 41, 47.   A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."

Thus, "When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its

task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims . . ." *Swierkiewicz, supra,* 534 U.S. 506, 510-11.

The Supreme Court re-affirmed *Swierkiewicz* in *Johnson v. City of Shelby*, 574 U.S. 10, 11, 135 S. Ct. 346, 347 (2014)

The district court disregarded these principles and dismissed with prejudice Counts IV and VII of Ms. Weatherly's second amended complaint, D.E. 49, which alleged that she was subjected to a hostile work environment.

Citing the elements of proof stated in *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir.1997), the court reasoned that "Plaintiff only offers conclusory allegations as to the frequency and severity of the conduct (referring to the conduct as "constant" and "severe") and whether the conduct was physically threatening or humiliating or interfered with Plaintiff's job performance." D.E. 68, p. 10.

The Plaintiff's factual allegations included that Carlos Melo and Ms. Robinson made constant loud, vulgar remarks in her presence, referring to persons in terms of their race, their national origin or both. D.E. 49, ¶¶21, 22. She alleged that she had to "listen each day and throughout her work day" to these remarks which made it difficult for her to concentrate and

perform her assigned tasks, that this was severe and pervasive harassment based on her race and national origin.  D.E. 49, ¶23.  She described the obscene remarks about Nadya Onischenko and Russian people in general, Melo and Robinson's vocal dislike of white people, calling them "gringos" in her presence and knowing she overheard them.  D.E. 49, ¶¶25 - 28.

She alleged that after learning of her complaints Melo referred to her as a "snitch," that she then found feces smeared on her car and her tires slashed, that the hostility intensified and there was a degrading change in her job duties.  D.E. 49, ¶¶43 - 47.

Dismissal of the hostile environment counts was harmful error.  They were essential to demonstrating ABC Legal's liability for the subsequent "tangible employment action" - her termination - which was brought about by the harasser, Melo.  His false statements were the sole basis for her termination.  "[C]ourts have consistently held employers liable for the discriminatory discharges of employees by supervisory personnel, whether or not the employer knew, should have known, or approved of the supervisor's actions" *Faragher v. City of Boca Raton*, 524 U.S. 775, 790, 118 S. Ct. 2275, 2284 (1998).

The district court erred in dismissing these claims with prejudice instead of following *Tiftarea Shopper, Conley* and *Swierkiewicz,* supra.

As in *Allen v. Tyson Foods*, supra, proof of the facts alleged in her second amended complaint could certainly support a finding that Ms. Weatherly's workplace at ABC Legal was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

**2.     Appellant exhausted her administrative remedies as to all her claims including her claim of national origin discrimination.**

Ms. Weatherly's Charge of Discrimination was filed with the U.S. Equal Employment Opportunity Commission ("EEOC") and also with the Florida Commission on Human Relations ("FCHR").  D.E. 85-6, p. 312.  In due course, she received a notice from the EEOC authorizing her to file a civil action under Title VII [D.E. 1-1].  As the FCHR had not issued any determination within 180 days of filing, Fla. Stat. §760.11(4) authorized a civil action under the Florida Civil Rights Act ("FCRA").

The narrative portion of her EEOC charge begins "Anna Weatherly is a white woman of Russian descent."  It describes her manager, Carlos Melo as Hispanic and her co-worker, Konya Robertson (sic) as African American and the loud, derogatory comments each of them made about white people

in general and about a manager named Nadya, a white woman in the Seattle office who also is from Russia. Some of these comments were merely derogatory (that Nadya was "stupid" and "bitchy"); others were obscene: that she "must be having an affair with the company's director" and was "blowing him under the table" during company conference calls.

In the section of the EEOC's form for specifying "Discrimination Based On" the only boxes checked are those for "race" and "retaliation." The box for "national origin" discrimination was not checked. Nonetheless, when ABC Legal's general counsel responded to the EEOC he understood that Ms. Weatherly's charge encompassed discrimination based on both race and national origin. The first of his "Findings" specifically addresses "Discrimination on the basis of race/national origin". He notes that Ms. Weatherly "complained that Carlos and Konya openly expressed dislike of an employee in the Seattle office, Nadya, a white woman of Russian descent," and denies they did so. D.E. 85-6. p. 319.

The permissible scope of a plaintiff's judicial complaint under Title VII is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," *Alexander v. Fulton County,* 207 F.3d 1303, 1332 (11th Cir. 2000). The facts stated control, not which boxes are checked.

Thus, the judicial complaint may encompass any kind of discrimination which is "like or related to" the allegations contained in the charge, *Gregory v. Ga. Dep't of Human Resources,* 355 F.3d 1277, 1280 (11th Cir. 2004) (failure to mark "retaliation" box did not bar that claim; the charge stated facts from which a reasonable EEOC investigator could conclude that what the plaintiff complained about was retaliation). Accord: *Green v. Elixir Indus.*, 407 F.3d 1163, 1167 - 1168 (11th Cir. 2005) (focus on termination did not bar an additional claim for harassment).

"[C]ourts must be "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]. *Id.* Such claims generally are allowed if, as here, they "amplify, clarify, or more clearly focus" the allegations in the original EEOC complaint, *Gregory*, supra, 355 F.3d 1277, 1279. As the company's general counsel recognized, national origin discrimination is implicit in the factual allegations of Ms. Weatherly's charge.

As in *Gregory* a claim which is like or related to these factual allegations and serves to amplify and clarify them should not have been barred because of her failure to check a particular box on the EEOC form. See *Henry v. University of S. Florida Bd. of Trustees*, 2009 U.S. Dist. LEXIS 115227, at *10-12 (M.D. Fla. Dec. 10, 2009): "Just as the Eleventh

Circuit determined that Gregory's sex and race discrimination claims were "inextricably intertwined" with her retaliation claims, the Court here finds that Henry's race and national origin claims may be inextricably intertwined."

 The court also followed *Bullard v. OMI Ga, Inc.,* 640 F.2d 632, 634 (5th Cir. 1981) which held that " 'national origin' discrimination is so closely related to racial discrimination as to be indiscernable. . . The line between national origin discrimination and racial discrimination is an extremely difficult one to trace").

EEOC regulations, 29 C.F.R. §1606.1, define national origin discrimination broadly to include "the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group." Justice Brennan cited this definition in his concurring opinion in *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 614, 107 S. Ct. 2022, 2028-29 (1987) noting that "[N]ational origin claims have been treated as ancestry or ethnicity claims in some circumstances. For example, in the Title VII context, the terms overlap as a legal matter," citing §1606.1, supra.

The former Fifth Circuit[2] emphasized that "[T]he crucial element of a charge of discrimination is the *factual* statement contained therein . . . The selection of the type of discrimination alleged, i.e., the selection of which box to check, is in reality nothing more than the attachment of a legal conclusion to the facts alleged."   *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970), holding that the plaintiff's failure to check the box marked "national origin" was a mere technical defect.

This Court should reverse the contrary holding of the district court in Ms. Weatherly's case, and allow her claim of national origin discrimination to proceed.

---

[2] The decisions of the former Fifth Circuit handed down prior to September 30, 1981, were adopted as precedent by the Eleventh Circuit, subject to the power of the Eleventh Circuit sitting *en banc* to overrule any such decision. *Bonner v. Prichard*, 661 F.2d 1206, 1210 (11th Cir. 1981)

**3.    Ms. Weatherly suffered an actual discharge, a material "adverse action" under Title VII.**

**A.    By their words and conduct the employer's representatives showed a clear intention to sever the employment relationship.**

An adverse employment action is one that a reasonable person would find causes a "serious and material change in the terms, conditions, or privileges of employment." *Griffith v. Nicholas Financial, Inc.*, 214 F. Supp. 3d 1215, 1225 (N.D. Ala. 2016) citing *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238-39 (11th Cir. 2001). The termination of a person's employment is the "classic and ultimate 'tangible employment action.'" *Griffith*, supra, quoting from *Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1246 n. 18 (11th Cir. 1998).

In *Griffith* the plaintiff was absent for health reasons. A week later she was given a poor performance evaluation, after which she was told to get her things and leave. When she spoke to someone in human resources she was told that her medical insurance would be terminated  immediately. The defendant claimed however, that she was only sent home for the day and did not return only because of her "subjective belief" she had been discharged.

Similar to this case the defendant "argue[d] that e-mail correspondence among several members of its management establish as a matter of law that Nicholas Financial did not discharge Ms. Griffith," *Griffith, supra,* 214 F. Supp. 3d 1215, 1226.  The district court held, however that "a jury could find, based on Nicholas Financial's words and actions, that Ms. Griffith could reasonably conclude that Ms. Adams fired her." *Id.*

The court followed this Court's decision in *Thomas v. Dillard Department Stores*, 116 F.3d 1432, 1437 (11th Cir. 1997) that in determining whether an actual termination occurred the words and the actions of the employer must both be considered.   "[T]he lack of specific words is not dispositive . . . The proper legal standard requires analysis of the employer's intent, which may be inferred not only from words but also from conduct, as well as the specific circumstances of the challenged job action."

Under this standard a termination occurs when an employer "by acts or words, shows a clear intention to dispense with the services of an employee." *Thomas, supra,* 116 F.3d 1432, 1434 (11th Cir. 1997) citing *Payne v. Crane Co.,* 560 F.2d 198, 199 (5th Cir.1977).  Summary judgment was not appropriate because nder the circumstances reasonable jurors in the exercise of impartial judgment might reach different conclusions as to whether Thomas was actually terminated. *Thomas, supra,* 116 F.3d 1432, 1437.  The same is true here.

**B.      A reasonable person in Ms. Weatherly's position would have believed she was discharged.**

In *Thomas* the Court cited *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 88-89 (2d Cir. 1996) in which the plaintiff left work after suffering a "nervous breakdown" and did not return.  As also happened to Ms. Weatherly, the defendant "turned aside plaintiff's efforts to reestablish communication with it" and "led her to believe she was not welcome to return."  The court concluded that a reasonable person in the plaintiff's shoes might have thought she was in fact discharged even though she received no termination letter.  It was therefore clear that material issues of fact remained genuinely disputed.

Here, the district court gave scant consideration to whether it was reasonable for Ms. Weatherly to believe she had been fired when she found she could not access her funds and Accrue Solutions told her this was because she had been terminated on November 1; or when she made it clear to Ms. Mirkovich that she had not quit and learned from her that she was no longer employed.  Instead the district court found that a reasonable person in ABC Legal's position "would have understood that Plaintiff voluntarily resigned."  D.E. 131, p. 17.

The district court's ruling conflicts with decades of applicable case law.  The former Fifth Circuit held that the test depends upon what the employee perceives.  "An employer need not use the term "fired" in order for a discharge to occur. The test of whether an employee was discharged depends upon the reasonable

33

inferences that the *employees* could draw from the language used by the employer."*NLRB v. Ridgeway Trucking Co.*, 622 F.2d 1222, 1224 (5th Cir. 1980) [emphasis added].

Other circuits follow the same rule, that the fact of discharge does not depend on the use of formal words of firing. "It is sufficient if the words or action of the employer 'would logically lead a prudent person to believe his tenure had been terminated'" *NLRB v. Trumbull Asphalt Co.*, 327 F.2d 841, 843 (8th Cir. 1964), opinion by Blackmun, quoting from *Putnam v. Lower*, 236 F.2d 561, 566 (9th Cir. 1956), a case under admiralty law.

Florida courts hold the same and require "evidence of a volitional choice" to support any determination of voluntary resignation by an employee. *Le Dew v. Unemployment Appeals Com.*, 456 So. 2d 1219, 1223-24 (Fla. Dist. Ct. App. 1984). "[A] person may be deemed discharged if the words and actions of the employer would logically lead a prudent person to believe his tenure had been terminated." *Id.* The Florida court cited *NLRB v. Trumbull Asphalt Company*, as well as *Young v. Southwestern S & L Association*, 509 F.2d 140 (5th Cir. 1975).

**3.    Genuinely disputed material facts preclude summary judgment as to Ms. Weatherly's allegations of discrimination based on her race and national origin.**

**A.    The evidence establishes a valid prima facie case of discrimination based on her race and ethnicity.**

"To make out a prima facie case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2008).

Even without similarly situated comparators, "the plaintiff will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Id.

The district court erred in holding that Ms. Weatherly and Konya Robinson were not "similarly situated." They reported to the same supervisor, were subject to the same personnel policies, no disciplinary issues and similar job duties. These factors are discussed in the prior *en banc* decision in *Lewis,* 918 F.3d 1213, 1226 (11th Cir. 2019).

As the Court subsequently said in *Lewis,* however*, "*Not every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator. Among other things, a proper comparator simply may not exist in every work place. Accordingly, a "plaintiff will always survive summary judgment if he presents . . . 'a convincing mosaic

of circumstantial evidence that would allow a jury to infer intentional discrimination.'" *Lewis v. City of Union City*, 934 F.3d 1169, 1185.

A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) "suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual. *Id.*

She may establish a prima facie case of discriminatory discharge by showing (1) that she was a member of a protected group and was adversely affected by an employment decision; (2) that she was qualified for her position; and (3) sufficient evidence from which a rational fact-finder could conclude that her employer intended to discriminate against her in making the discharge decision. *Standard v. A.B.E.L. Services*, 161 F.3d 1318, 1331 (11th Cir. 1998).

The last element was met in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973) by showing that after plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.  The same is true in this case.  After falsely stating that Ms. Weatherly quit her job Mr. Melo was quick to ask the HR director Jenny Davis if he could fill her position.

36

Plaintiff, who is Caucasian, white and born in Russia belongs to a protected class; both Title VII and the FCRA prohibit discrimination based on race, color and national origin. She was fully qualified to do the job for which she was hired and did it well, according to Mr. Melo.

In several respects Mr. Melo treated Ms. Robinson, an African-American, more favorably. He refused Ms. Weatherly's requests to take time off for doctor appointments but allowed Ms. Robinson to take time off on every day available on his calendar and for any reason. Ms. Robinson often took longer lunch breaks than the 30 minutes they were allowed. Ms. Weatherly overheard Melo saying he would change her hours. D.E. 97-1, p. 68, 15 - p. 69, 5; p. 69, 19-23. Melo denied all of Ms. Weatherly's requests to use the paid time off (PTO) she had earned. During the last month she worked there Mr. Melo "wasn't communicating with me at all. He was only communicating with Konya and treated me like I wasn't even there." D.E. 97-1, p. 31 lines 13-15.

The district court held that the favoritism Mr. Melo afforded to Konya Robinson is not evidence of bias on his part because Ms. Robinson is not a valid "comparator" primarily because of factors such as her length of employment and differences in her job responsibilities.

These considerations are not dispositive. A similarly situated comparator will have (1) engaged in the same basic conduct or misconduct as the plaintiff; (2) been subject to the same employment policy, guidelines, or rules; (3) worked under the same supervisor; and (4) shared a similar employment or disciplinary history with the plaintiff. *Cooper v. Ga. DOT,* 837 F. App'x 657, 667 (11th Cir. 2020).

Ms. Robinson had been employed by ABC Legal longer than Ms. Weatherly. Her responsibilities for the paperwork differed in that Ms. Weatherly primarily scanned and Konya primarily printed the legal documents. They are the same however in the relevant characteristics. "The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies. (citation omitted). Nor will minor differences in job function disqualify a would-be comparator." *Lewis (en banc* decision*), 918 F.3d 1213, 1227.

As noted, however, "the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011). Even without similarly situated comparators, "the plaintiff will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

38

Accordingly, a "plaintiff will always survive summary judgment if he presents . . . 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination . . . A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) "suspicious timing, ambiguous statements . . . and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual.   *Lewis*, supra, 934 F.3d 1169, 1185.

There is evidence in the record as to timing, ambiguous statements, better treatment of Ms. Robinson and, especially, evidence that the Defendants' justification that Ms. Weatherly quit her job is pretextual, as discussed below.

**B.   The evidence taken as a whole would allow a reasonable fact-finder to conclude that the Defendants' proffered reasons are pretexts for discrimination.**

The focused inquiry in the last step of the McDonnel-Douglas analysis requires the plaintiff to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could

39

find them unworthy of credence." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 (11th Cir. 2008) citing and quoting from *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997).

## 1. The evidence would permit a reasonable fact-finder to disbelieve Defendants' assertion that Ms. Weatherly resigned.

After Defendants put forth a purported non-discriminatory reason for their actions Plaintiff may avoid summary judgment by creating a genuine issue of material fact as to whether the reason advanced is a pretext, that is that "the proffered reason was not the true reason for the employment decision . . . She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981).

"The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional

discrimination." *Reeves*, supra, 120 S. Ct. 2097, 2108. Also see *Combs v. Plantation Patterns,* 106 F.3d 1519 (11th Cir. 1997) which the Supreme Court cited with approval in *Reeves*.

Plaintiff creates a genuine issue as to pretext by presenting "sufficient evidence to allow a reasonable fact-finder to conclude that the proffered reasons were not actually the Defendants' motivation for her discharge." *Standard v. A.B.E.L. Services.*, 161 F.3d 1318, 1332 (11th Cir. 1998). She may do this (1) by showing that the purported legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. *Standard,* supra, citing *Burdine*.

The evidence here would allow a reasonable jury to disbelieve Defendants' proffered reason for Ms. Weatherly's termination - that she actually quit her job. No one but Mr. Melo took her "medical leave" email to mean that she was quitting. A jury might well question how anyone could read her "medical leave" email to say that. Besides her email she told Mr. Melo that she would return to work within a week after her surgery. She said this to Ms. Mirkovich. Mr. Melo denies it, creating a factual issue that is not only genuine but, in this case, critical.

Ms. Mirkovich received her "medical leave" email two days after Ms. Weatherly had asked her if she could take medical leave and keep her job and after she sent Ms. Weatherly her affirmative reply.  Yet she did not try to contact Ms. Weatherly to ask what she intended. Even when it became clear there was "a miscommunication" and all were aware that Ms. Weatherly did not quit, Ms. Mirkovich and the HR director decided to go with Mr. Melo's obviously false statement.

**2.    Mr. Melo's racially charged comments permit a finding that discrimination more likely motivated Defendants' termination of Ms. Weatherly.**

Additional evidence would allow a reasonable jury to conclude that discriminatory reasons more likely motivated the decision than the proffered reasons, as in *Standard,* supra, specifically Melo's frequent derogatory comments about people who are white ("gringos") and lewd comments about those of Russian descent.   Ms. Weatherly reasonably perceived that his comments were aimed at her as well as Ms. Onishchenko and others in the Seattle office.

Summary judgment was denied in *Kademiya v. Hunter Douglas Window Fashions, Inc.*, 2006 WL 1991754, 2006 U.S. Dist. LEXIS 47884, at *13 (D. Colo. July 13, 2006) because a lone comment about "too many

42

Russians working for defendant" could be found by a reasonable jury to indicate national origin bias on the part of the plaintiff's supervisor.

Similarly, a supervisor's comment "that people of Russian descent consume copious amounts of alcohol" created a genuine issue as to whether a protected characteristic, plaintiff's national origin, was the basis for the harassment plaintiff alleged. *Suevsky v. Walt Disney World Parks & Resorts Online, Inc.*, 2016 WL 3387620, 2016 U.S. Dist. LEXIS 79829, at *3 (M.D. Fla. June 20, 2016). (Summary judgment for the defendant was granted on other grounds). Melo's comments were considerably more derogatory than these.

**4.    There are genuine disputes as to material facts which preclude summary judgment as to Ms. Weatherly's claims of retaliation for protected opposition activity.**

**A.    Ms. Weatherly engaged in statutorily protected activity when she opposed apparent racial discrimination against Leonard Gartman and Jason Jones.**

In order to prove unlawful retaliation under Title VII, a "plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." *Gregory,* supra, 355

43

F.3d 1277, 1279 citing *Little v. United Technologies, Carrier Transicold Division,* 103 F.3d 956, 959 (11th Cir. 1997).  The Florida courts apply the same elements when considering cases brought under the FCRA, see *Donovan v. Tequesta v. Luscavich*, 240 So. 3d 733, 738 (Fla. 4th D.A, 2018); *Broward County. Bd. of Commissioners*, 974 So. 2d 458, 460 (Fla. 4th DCA 2008).  There is a genuine dispute as to facts which are material to each of these elements.

Under Title VII, it is an unlawful employment practice for an employer to discriminate against any of its employees "because he has opposed any practice made an unlawful employment practice by this title [42 USCS §§ 2000e–2000e-17], the so-called "opposition clause." The FCRA likewise prohibits such discrimination using essentially the same language.  Fla. Stat. §760.10(7).

These provisions are broadly interpreted, and for good reason as the Supreme Court said in *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 2414 (2006):

"Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses . . . Interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends."

44

When an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, as Ms. Weatherly did, that communication "virtually always constitutes the employee's opposition to the activity." *Crawford v. Metropolitan Gov't of Nashville and Davidson County, Tennessee,* 555 U.S. 271,276; 129 S.Ct. 846, 850 (2009).

Importantly, an employee is protected whether or not she can prove that the conduct she opposed was actually unlawful.  Requiring proof "would not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation on informal adjustment of grievances." *Little,* supra, 103 F.3d 956, 960.  She must only show that in good faith she believed that her employer was engaged in unlawful employment practices and that her belief was objectively reasonable in light of the facts. *Id.*

Ms. Weatherly's testimony shows that when she reported Ms. Robinson's treatment of the white process servers she believed in good faith that she was reporting "discrimination in its purest form," and that her belief was reasonable.  D.E. 97-1. p. 155, 16-156, 9.  Ms. Robinson told Ms. Weatherly about a female process server who had been "up her nose" and was no longer there because she had been given fewer and fewer leads and

was finally told there was no more work for her.  It was apparent to Ms. Weatherly that Ms. Robinson began doing the same to Leonard Gartman and Jason Jones, while providing much of the work to a young African American woman

**B.    She engaged in statutorily protected activity when she complained to ABC Legal's human resources director Jenny Davis about unlawful discrimination and the retaliation she experienced following her previous complaint.**

Ms. Onishchenko confirmed in her deposition that Ms. Weatherly called her to complain and to share the information that was distributed about Ms. Onishchenko in the Dania Beach office.  D.E. 85-4, p. 20, 7-12. She called more than once about the same matters.  D.E. 85-4, p. 28-2 - p. 29, 15; p. 48, 4-6.  Nadya referred her to Jenny Davis who was in charge of human resources.  D.E. 85-4, p. 29, 16-20

She reached out to Ms. Davis and complained that she was called a "snitch" for reporting racial discrimination, then found the damage to her car; that Melo and Ms. Robinson had almost stopped speaking to her but made slurs about white people and obscene comments about her nationality and Nadya's which she believed were also aimed at her. She asked Ms. Davis "is there anything you can do to help me."  Ms. Davis said

she would get back to her but never did so.  D.E. 97-1, p. 161, 12 - p. 163, 20. Other than circumstantially she cannot prove who damaged her car but the evidence shows that nothing was done regarding her complaints about this and other matters.

Ms. Weatherly's complaints to both Ms. Onishchenko and Ms. Davis can fairly be called protected activity under the opposition clause.

**C.    Immediately afterward she suffered adverse actions both within and outside the workplace.**

The anti-discrimination provisions of Title VII and FCRA promote "a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status." *Burlington Northern & Santa Fe Ry. v. White*, cited supra, 126 S. Ct. 2405, 2412. "The anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Id.*

Based on its differing purpose and language the Supreme Court held in *Burlington Northern,* supra, that 42 U.S. C. §2003-3 "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace."  To show that she suffered a materially adverse action a plaintiff must only show that the employer's action "might have

47

dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern,* supra, 126 S. Ct. 2405, 2009 - 2415. Unlike the prohibition against disparate treatment there is no requirement that plaintiff point to a similarly situated employee. *Roberts v. Rayonier, Inc.*, 135 F. App'x 351, 358 (11th Cir. 2005).

The hostility Ms. Weatherly suffered soon after complaining to her Nadya, her ultimate termination as well as the treatment she received when Ms. Davis and Ms. Mirkovitch learned that Melo lied when he said she "quit yesterday" are all adverse actions which support a prima facie case of retaliation.

**D.    A jury could reasonably conclude that the employer's actions were causally related to her protected activity.**

To prove a causal connection, a plaintiff must only to demonstrate that the protected activity and the adverse action were not *wholly unrelated*." *Farley v. Nationwide Mutual Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999); *Roberts v. Rayonier, Inc.*, 135 F. App'x 351, 358 (11th Cir. 2005).   The plaintiff must, of course, provide evidence that the decision-maker became aware of the protected conduct.  This may be established by circumstantial evidence." *Roberts,* supra; *Farley, supra,* 197 F.3d 1322, 1336.

Within a day of her report to Nadya Onishchenko about Ms. Robinson's discriminatory distribution of work to the process servers, Ms. Onishchenko told Mr. Melo she was taking control of these assignments away from the Dania Beach office. Melo's pointed comments to Ms. Robinson the next day that there must be a "snitch" in the office shows, at least circumstantially, that he was aware that Ms. Weatherly was the one who reported Ms. Robinson's conduct.

"Temporal proximity" between his awareness and the adverse actions suffice to show a causal connection.   In *Farley,* supra, the fact that the plaintiff was terminated within seven weeks of his protected activity was sufficient.   Melo's hostility toward Ms. Weatherly began immediately after his conference call with Nadya, in mid-September.   She was terminated six weeks later only because Melo falsely told human resources that "Anna Weatherly quit yesterday."

Ms. Weatherly personally complained to Ms. Davis regarding both Ms. Robinson's discrimination against the process servers and Mr. Melo's discrimination and retaliatory actions toward her.   A jury could reasonably find that Ms. Davis's participation in Ms. Weatherly 's termination would not have occurred absent her complaints.   She received a copy of her "medical leave" email and failed to investigate Melo's conflicting statement

49

that she quit.  She did nothing after Ms. Mirkovich told her there was a "miscommunication" and that Ms. Weatherly thought she was on an authorized medical leave.

Rather than speak to her or otherwise investigate why Melo claimed that she quit, Ms. Davis, along with Ms. Mirkovich, decided to accept his false statement and record Ms. Weatherly's termination as "voluntary" even though they both knew it was not.

### E.     Evidence of pretext creates a genuine issue, precluding summary judgment

There is ample evidence upon which a reasonable jury could find each element of a prima facie case of retaliation: protected opposition to discrimination and retaliation, adverse employment actions, and a causal nexus.  ABC Legal proffered "voluntary resignation" as a purported non-discriminatory reason for its actions.     The evidence demonstrates otherwise, that Ms. Weatherly "will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation."  *Farley,* supra, 197 F.3d 1322, 1336.  The evidence creates a genuine issue as to the credibility of the defendant's proffered reason:

> Disbelief of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence to support a

finding of discrimination. Therefore, . . . a plaintiff is entitled to survive summary judgment, . . . if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action. *Farley,* supra, 197 F.3d 1322, 1337.

A reasonable jury could disbelieve Melo's claim and Defendants' assertion that Plaintiff quit her job and find that discrimination and retaliation actually motivated her termination.

**5.    The discriminatory and retaliatory conduct may be attributed to the Defendants-Appellees.**

**A.    ABC Legal is liable for tangible adverse actions which are based on the actions of a biased supervisor.**

Claims such as Ms. Weatherly's "for discriminatory employment actions with tangible results, like hiring, firing, promotion, compensation, and work assignment, have resulted in employer liability once the discrimination was shown . . . [C]ourts have consistently held employers liable for the discriminatory discharges of employees by supervisory personnel, whether or not the employer knew, should have known, or approved of the supervisor's actions" *Faragher v. City of Boca Raton*, 524 U.S. 775, 790, 118 S. Ct. 2275, 2284 (1998).

Directly or indirectly, Melo's actions led the company to sever the employment relationship.

**B.    Mr. Melo's bias and intention to cause an adverse employment action demonstrate "cat's paw" liability on the part of ABC Legal.**

**1.    The human resource personnel acted on his recommendation without independently investigating his contention that Ms. Weatherly quit and his denial that she discussed her surgery with him before taking medical leave.**

A plaintiff may establish causation if the decision maker followed a supervisor's biased recommendation without independently investigating the facts he provided. *Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1332 (11th Cir. 1999).   A genuine issue is thus created by Ms. Davis' failure to look into Melo's statement that Plaintiff "quit yesterday," especially after she learned that Ms. Weatherly did not quit and thought she was still employed, that there was a "miscommunication by all involved."

**2.    Melo's biased reports were the proximate cause of Ms. Weatherly's termination.**

Under the "cat's paw" principle stated in *Staub v. Proctor Hosp.*, 562 U.S. 411, 422, 131 S. Ct. 1186, 1194 (2011) if a supervisor performs an act motivated by discriminatory animus that is întended to cause an adverse

employment action and if that act is a proximate cause of the ultimate employment action, then the employer is liable.

Mr. Melo displayed a bias toward Ms. Weatherly's race and national origin and after learning of her complaint, retaliatory animus as well, by loudly referring to a "snitch" in the office.  When he received her "medical leave" email he promptly informed human resources she had quit with the express intention of replacing her.

When Ms. Davis learned that Anya thought she had only taken medical leave she could have met with Ms. Weatherly to clear up the misunderstanding.   Even a telephone call might have sufficed "to except this case from the cat's paw line of cases," as in *Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998).   Ms. Davis made no such effort, however.

In *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) the Court discussed the elements of "cat's paw" causation:

[D]iscriminatory animus may be imputed to a neutral decision maker under a "cat's paw" theory if: (1) a supervisor performed an act motivated by animus that was intended to cause an adverse employment action; and (2) the act was a proximate cause of the adverse employment action [citing Staub].  A plaintiff may establish

causation under this theory if the decision maker either followed another supervisor's biased recommendation without independently investigating the complaint or conducted an independent investigation but relied on facts provided by the biased supervisor.

The Court indicated, however, that such an analysis might not be appropriate in cases of alleged retaliation where traditional "but-for" causation is the standard. (*Reynolds* involved a claim of retaliation under the False Claims Act). Cf. *Hankins v. Air Trans Airways,* 237 Fed. Appx. 513, 520 at Note 5 in which the Court discussed whether plaintiff could establish her retaliation claim using "cat's paw" causation).

If this method of proof is only appropriate in disparate treatment cases there is ample evidence of Melo's bias against persons of Ms. Weatherly's race and ethnicity to apply it here.

## CONCLUSION

This Court should find that genuine disputes as to the material facts preclude summary judgment. The Court should reverse the decision of the district court and remand this case for trial.

54

Respectfully submitted on August 21, 2023.

DONALD R. McCOY, P. A.
111 S.E. 12th Street
Fort Lauderdale, Florida 33316
Telephone: (954) 618-6575
Facsimile: (954) 618-6577
mccoyesquire@me.com

By_____/s/_____
        Donald R. McCoy
        Florida Bar No. 887862

        Attorney for Plaintiff

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.    This document complies with the type-volume limit of Fed. R. App. P. 32 because, except for excluded sections, this document contains 11,734 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Apple Pages in Georgia 14 point font.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 21, 2023, a true and correct copy of the foregoing was furnished to all parties listed on the Service List, below, by filing this document via the Court's CM/ECF System.


_____/s/_____
Rosemarie S. McCoy

<u>SERVICE LIST</u>:

Tripp Scott, P.A.
110 SE 6th Street, 15th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-7500
Telefax: (954) 761-8475

SETH J. DONAHOE, ESQ.
eservice@trippscott.com (primary)
sjd@trippscott.com (secondary)
sgc@trippscott.com (secondary

JENNIFER WAHBA, ESQ.
jmh@trippscott.com